Ronald DAVIDSON, Plaintiff,

v.

M.D. Uday K. DESAI, M.D. Cheng Yin, N.P. Herman Fowler, M.D. Lester Wright, M.D. Marshall Trabout, Floyd Bennett, former Superintendent of the Elmira Correctional Facility ("ECF"), R.N. Anne Rabideau, former nurse administrator at ECF, Calvin West, First Deputy Superintendent of ECF and Present Acting Superintendent of ECF, R.N. Marijon Hopkins, present nurse administrator at ECF, R.N. Katherine Frawley, staff nurse at ECF, R.N. Deborah Bartlett–Bigg, former acting nurse administrator at ECF and current staff nurse at ECF, Sheryl Graubard, supervisor of the Inmate Grievance Program at the ECF, Thomas Eagen, Director of the Inmate Grievance Program, assigned to the DOCS central office in Albany, N.Y., R.N. Nancy O'Connell, past ECF nurse administrator, Wexford Health Services (or whatever other corporation name they are known by) and their officers and executives, Dana Smith, former First Deputy Superintendent at Elmira C.F., M.D. Wesley Canfield, present facility health services director at Elmira C.F., Robert Guzman, former deputy superintendent of programs at Elmira C.F., and Glenn Goord, Defendants.

No. 03–CV–00121S(F).

United States District Court,
W.D. New York.

Aug. 25, 2011.

Ronald Davidson, Wallkill, NY, pro se.

Eric T. Schneiderman, Attorney General, State of New York, George Michael Zimmermann, Assistant New York Attorney General, of Counsel, Buffalo, NY, for Defendants.

## ORDER

WILLIAM M. SKRETNY, Chief Judge.

Presently before this Court are Objections to the Magistrate Judge's Report & Recommendation. Having reviewed the Report & Recommendation *de novo*, after considering the Objections and the parties' submissions, see 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Local Rule 72.3(a), this Court concurs with the findings and recommendations contained in the Report & Recommendation. Accordingly, the Objections are DENIED, and the Report & Recommendation is ACCEPTED in its entirety, including the authorities cited and the reasons given therein.

IT HEREBY IS ORDERED, that the 140 Report & Recommendation is ACCEPTED. Further, that the Objections 141, 146 are DENIED. Further, that the Defendants' 106 Motion for Judgment on the Pleadings or for Summary Judgment is GRANTED in part and DENIED in part, consistent with the Magistrate Judge's recommendations. FURTHER,

that Plaintiff and counsel for Defendants shall appear before this Court on October 7, 2011, at 9:00 a.m. to discuss how this case will proceed. FURTHER, that Defendants' counsel shall arrange to have Plaintiff available by telephone at his correctional facility for the status conference and shall provide to the Courtroom Deputy the number at which Plaintiff can be reached at least two days before the status conference.

SO ORDERED.

## REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by Honorable William M. Skretny on August 10, 2009, for a report and recommendation on dispositive motions. The matter is presently before the undersigned on Defendants' motion for summary judgment (Doc. No. 106), filed November 18, 2009.

### *BACKGROUND*

Plaintiff Ronald Davidson ("Plaintiff" or "Davidson"), proceeding *pro se*, commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on February 18, 2003, while incarcerated at Elmira Correctional Facility ("Elmira" or "the correctional facility"). Defendants to this action, all current or former employees of New York State Department of Corrections ("DOCS"), include M.D. Uday K. Desai ("Dr. Desai"), M.D. Cheng Yin ("Dr. Yin"), N.P. Herman Fowler ("N.P. Fowler"), M.D. Lester Wright ("Dr. Wright"), M.D. Marshall Trabout ("Dr. Trabout"), former Elmira Superintendent Floyd Bennett ("Bennett"), former Elmira Nurse Administrator R.N. Anne Rabideau ("R.N. Rabideau"), Elmira First Deputy and Acting Superintendent Calvin West ("West"), Elmira Nurse Administrator R.N. Marijon

Hopkins ("R.N. Hopkins"), Elmira staff nurse R.N. Katherine Frawley ("R.N. Frawley"), former Elmira Acting Nurse Administrator and current staff nurse R.N. Deborah Bartlett–Bigg ("R.N. Bartlett–Bigg"), Elmira Inmate Grievance Program ("IGP") Supervisor Sheryl Graubard ("Graubard"), DOCS IGP Director Thomas Eagen ("Eagen"), past Elmira Nurse Administrator R.N. Nancy O'Connell ("R.N. O'Connell"), Wexford Health Services ("Wexford"), former Elmira First Deputy Superintendent Dana Smith ("Smith"), present Elmira Health Services Director M.D. Wesley Canfield ("Dr. Canfield"), former Elmira Deputy Superintendent of Programs Robert Guzman ("Guzman"), and DOCS Commissioner Glenn Goord ("Goord") (together, "Defendants"). With the exception of Wexford who, by order dated March 19, 2003 (Doc. No. 2), was terminated as a Defendant to this action, all Defendants have been served and have appeared in this action.

Plaintiff asserts 12 claims for relief alleging violations of his First, Eighth and Fourteenth Amendment rights, largely challenging the medical care Plaintiff received, or failed to receive, while incarcerated at Elmira, and the handling of numerous Inmate Grievances Plaintiff filed regarding his medical treatment. Plaintiff's 12 claims for relief include (1) deliberate indifference to serious medical need in connection with a "discogram" medical procedure Plaintiff underwent on November 24, 1999 ("First Claim"); (2) deliberate indifference to serious medical need in connection with a surgical procedure on Plaintiff's shoulder originally scheduled for December 15, 2000 ("Second Claim"), (3) denial of medical treatment for allergies ("Third Claim"); (4) denial of medical treatment for shortness of breath and asthma ("Fourth Claim"); (5) exposure to second-hand tobacco smoke and other allergens ("Fifth Claim"); (6) deprivation of

privacy based on the sick call procedure ("Sixth Claim"); (7) failure to provide proper eye glasses ("Seventh Claim"); (8) failure to provide a proper diet ("Eighth Claim"); (9) interference with Plaintiff's attempts to file Inmate Grievances ("Ninth Claim"); (10) tying Plaintiff's access to specialized medical care to Plaintiff's compliance with certain conditions not otherwise required under the law ("Tenth Claim"); (11) repeatedly ignoring Plaintiff's requests for sick call ("Eleventh Claim"); and (12) refusing to provide Plaintiff with certain medical records ("Twelfth Claim"). Defendants' answer (Doc. No. 27) ("Answer"), was filed September 23, 2004.

On November 18, 2009, Defendants filed the instant motion for summary judgment (Doc. No. 106) ("Defendants' motion"), with supporting papers, including the Declarations of Floyd Bennett (Doc. No. 107) ("Bennett Declaration"), Dr. Wesley Canfield (Doc. No. 108) ("Dr. Canfield Declaration"), Dr. Uday Desai (Doc. No. 109) ("Dr. Desai Declaration"), Thomas Eagen (Doc. No. 110) ("Eagen Declaration"), Herman Fowler (Doc. No. 111) ("Fowler Declaration"), Assistant Attorney General George M. Zimmermann (Doc. No. 112) ("Zimmermann Declaration") with attached exhibits A (portions of Plaintiff's June 29, 2007 deposition testimony ("Plaintiff's Dep. Tr. at ——")), and B (Plaintiff's certified medical record, Bates stamped 000001–001216 ("Medical Record at Bates No. ——")), Sheryl English (Doc. No. 113) ("English Declaration"), Marijon Hopkins (Doc. No. 114) ("Hopkins Declaration"), Anne Rabideau (Doc. No. 116) ("Rabideau Declaration"), Dr. Marshall Trabout (Doc. No. 117) ("Dr. Trabout Declaration"), Dr. Lester Wright (Doc. No. 118) ("Dr. Wright Declaration"),[1]

Dr. Cheng Yin (Doc. No. 119) ("Dr. Yin Declaration"), and Defendants' Memorandum of Law in Support of Motion to Dismiss Pursuant to F.R.C.P. 56(a) and Motion for Summary Judgment Pursuant to F.R.C.P. 12(c) and 56(a) (Doc. No. 115) ("Defendants' Memorandum").

After several extensions of time in which to file papers opposing Defendants' motion, including a stay while Plaintiff sought to have counsel appointed, Plaintiff, on September 8, 2010, filed his Affidavit in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 131) ("Plaintiff's Affidavit"), attached to which is Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Pursuant to F.R.C.P. 5(a) and Motion for Summary Judgment Pursuant to F.R.C.P. 12(c) and 56(a), Date 18 November 2010 ("Plaintiff's Response"), with attached exhibits A though G ("Plaintiff's Exh(s). ——"). On November 10, 2010, Defendants filed Defendants' Reply Memorandum of Law in Support of Motion to Dismiss and Motion for Summary Judgment (Doc. No. 133) ("Defendants' Reply"), and a Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (Doc. No. 134) ("Defendants' Statement of Facts").

By letter to the undersigned dated November 17, 2010 (Doc. No. 135), Plaintiff requested permission to file a sur-reply. By Text Order entered November 24, 2010 (Doc. No. 136), Plaintiff's request to file a sur-reply was granted. Accordingly, on January 31, 2011, Plaintiff filed his Supplemental Affidavit in Opposition to Defendants' [*sic*] (Doc. No. 138) ("Plaintiff's Supplemental Affidavit"),[2] and, on February 1, 2011, Plaintiff filed his Sur–Reply

---

1. The Dr. Wright Declaration was refiled on November 19, 2009 (Doc. No. 120), to correct an electronic signature error.

2. In a letter to the undersigned dated January 17, 2010 (Doc. No. 137), Plaintiff advises of some typographical errors in Plaintiff's Supplemental Affidavit.

(Doc. No. 139) ("Plaintiff's Sur–Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendants' motion should be GRANTED in part and DENIED in part.

## FACTS [3]

At all times relevant to this action, Plaintiff Ronald Davidson ("Plaintiff" or "Davidson"), an inmate in the custody of New York State Department of Correctional Services ("DOCS"), was incarcerated in Elmira Correctional Facility ("Elmira" or "the correctional facility"). Plaintiff makes numerous allegations regarding the medical care and treatment he either received or was denied while housed at Elmira, as well as the mishandling of various inmate grievances Plaintiff filed in connection with his medical care.

On November 24, 1999, Plaintiff was escorted by DOCS personnel to Strong Memorial Hospital ("Strong Memorial") in Rochester, New York, were Plaintiff underwent a discogram procedure, which involved injecting dye into Plaintiff's spinal discs followed by an X-ray examination. On November 25, 1999, after returning to Elmira, Plaintiff, as a result of the discogram, developed back pain and a fever which symptoms Plaintiff maintains Defendants ignored. On November 26, 1999, Plaintiff was escorted by DOCS personnel back to Strong Memorial for a barium swallow study but because Plaintiff continued to complain of back pain caused by the discogram, rather than undergoing the barium swallow procedure, Plaintiff was taken to Strong Memorial's emergency room, and then ordered back to Elmira where Plaintiff was admitted into the infirmary by Defendant N.P. Fowler, and treated by Drs. Yin and Desai, who diagnosed Plaintiff with an infection, which was treated with blood tests, antibiotics and a CT scan. Plaintiff maintains his request

to be returned to Strong Memorial for examination by the neurosurgeons who performed the discogram was ignored. On December 16, 1999, Drs. Yin and Desai discharged Plaintiff from Elmira's infirmary, returned Plaintiff to his cell, despite Plaintiff's allegations that he "was barely able to walk," Complaint ¶ 13, "was often unable to walk to the infirmary to get [his] medicine." *Id.* ¶ 14. After his discharge from the infirmary, Plaintiff's pain medication was reduced, Complaint ¶ 14; Defendants' Statement of Facts ¶ 10, although Plaintiff continued to receive pain medication, was provided with a heating pad, placed on two-weeks bed rest, and his temperature checked twice a day. Defendants' Statement of Facts ¶ 10.

Plaintiff maintains he was scheduled for a December 27, 1999 neurological examination at Strong Memorial, which appointment was cancelled by Bennett for unspecified "security reasons," Complaint ¶¶ 16–19. Plaintiff also maintains an inmate grievance he filed regarding the cancellation of the December 27, 1999 neurological examination was ignored, and Plaintiff's inquiries to IGRC Supervisor Graubard were to no avail. *Id.* ¶¶ 20–22. According to Defendants, upon Plaintiff's December 16, 1999 discharge from Elmira's infirmary, a request for an emergency neurological consultation with Dr. Goyal at Strong Memorial was submitted, and Plaintiff was examined by Dr. Goyal on January 4, 2000. Defendants' Statement of Facts ¶ 11. At Dr. Goyal's request, Plaintiff was examined by another consultant on January 10, 2000, *id.,* and subsequently underwent examinations of his back by outside consultants several times in February and March 2000, and given physical therapy. *Id.* ¶¶ 11–12.

Plaintiff maintains that at one of his appointments at Strong Memorial in Janu-

---

**3.** Taken from the pleadings and motion papers filed in this action.

ary 2000, a Dr. Paul Pollice ordered an MRI on Plaintiff's back, but Defendants refused. Complaint ¶¶ 25–27. After Plaintiff wrote to his elected representatives, the MRI was performed at Strong Memorial on October 16, 2001, *id.* ¶ 28, but Defendants continued to refuse to let Plaintiff return to Dr. Pollice for follow-up treatment. *Id.* ¶¶ 31–33, 35.

Plaintiff was scheduled on December 15, 2000, for surgery on his shoulder joint to be performed by an orthopedist, Dr. John Mosher ("Dr. Mosher"), at State University of New York ("SUNY") Upstate Medical Center in Syracuse, New York ("SUNY Upstate"). Complaint ¶¶ 84–85. The surgical procedure was cancelled, however, with Plaintiff attributing the cancellation to N.P. Fowler, with the approval of Drs. Yin and Desai, because Plaintiff had refused to undergo a required pre-operation chest X-ray, which Plaintiff maintains his medical records establish was not required. *Id.* ¶¶ 86–88. Defendants, in contrast, assert that Dr. Mosher, an orthopedist, who was associated with Wexford, a medical firm that had contracted with DOCS to provide medical services to inmates, Defendants' Statement of Facts ¶ 13, later discontinued his association with Wexford, resulting in a cancellation of Plaintiff's shoulder surgery. *Id.* Following the cancellation of Plaintiff's shoulder surgery, Plaintiff was examined by another orthopedist, Dr. Kaempffe, who recommended more conservative treatment instead of surgery, *id.* ¶ 15, which Plaintiff maintains has caused him unnecessary pain and suffering. Complaint ¶¶ 92–93.

Plaintiff, under Dr. Kaempffe's care, has been referred to a pain management clinic, and also prescribed methadone, for which Plaintiff maintains his prescriptions regularly expire without being timely renewed, causing Plaintiff not only to experience a return of his back pain, but also withdrawal symptoms from the narcotic pain reliev-

er. To date, Plaintiff has not undergone the surgical procedure recommended by Dr. Mosher. Complaint ¶¶ 92–93.

The record establishes that Defendants arranged for Plaintiff, who suffers from breathing difficulties and possible asthma, to undergo allergy testing by an allergist, Dr. Sikorski, who recommended Plaintiff undergo a series of allergy sensitivity injections. On March 25, 2002, Plaintiff was examined by another allergist, one Dr. Sivak, following which allergy sensitivity injections were recommended. Dr. Sivak also suggested Plaintiff undergo a "methacholine challenge test" (breathing test for diagnosing asthma), if allergy injections did not help alleviate Plaintiff's allergy symptoms. When Plaintiff arrived for his first allergy injection on April 10, 2002, Plaintiff objected to the fact that the injection serum was not drawn into the syringe within Plaintiff's view, such that Plaintiff did not trust that he was receiving the correct serum and refused the injection. For the same reason, Plaintiff subsequently refused the allergy injections on May 7 and 14, 2002. Because the allergy serum has a limited life span, it became outdated and unusable with Plaintiff never having received an injection. Because Plaintiff never received any allergy injections, it was not possible to determine whether Plaintiff would have responded to such injections, such that the methacholine challenge test was not medically indicated.

Defendant, claims that exposure to second-hand smoke or environmental tobacco smoke ("ETS"), as well as other allergens, including dust and mold, has exacerbated his breathing difficulties, and has sought to be permanently housed in Elmira's infirmary, which Plaintiff maintains is the only part of the correctional facility where DOCS's ban on indoor smoking is consistently enforced, and where the windows

are sealed against outside allergens and the area is properly ventilated.

On April 23, 2002, Plaintiff underwent a right middle finger trigger release ambulatory surgical procedure performed by Dr. Kaempffe at Wayne Regional Orthopaedics in Williamson, New York. Following the surgical procedure, Plaintiff was discharged and returned to Elmira, and provided with a postoperative hand surgery instruction sheet, and prescribed Tylenol and Codeine #3. Dr. Kaempffe also advised Plaintiff should return for a follow-up examination in six weeks, and outpatient therapy arranged with regard to range of motion of Plaintiff's right, middle finger.

Plaintiff asserts other claims regarding his medical care and treatment at Elmira. Specifically, Plaintiff alleges he has routinely experienced problems having his prescriptions for corrective lenses filled by DOCS's eyeglass laboratory, and has also been denied requests to obtain prescription eyewear from outside sources, despite the fact that DOCS's regulations permit it. Plaintiff also maintains he has been denied a prescribed low fat, low salt, kosher meal, resulting in elevated blood pressure and cholesterol readings. Plaintiff further contends that Defendants have repeatedly denied Plaintiff's requests for sick call slips, resulting in a denial of treatment at sick call.

Plaintiff also maintains that Defendant Graubard repeatedly ignored or intentionally lost numerous grievances Plaintiff filed with regard to these allegations, that Elmira's sick call policy requiring that, prior to seeing a physician or nurse practitioner, Plaintiff discuss his medical issues with a nurse while in close proximity to other inmates at sick call, such that the inmates were able to overhear each other's discussions of their medical concerns, violated Plaintiff's right to privacy, and that Defendants denied Plaintiff's requests for

his medical treatment plan upon being discharged from the hospital.

## DISCUSSION

Defendants' motion seeks judgment on the pleadings and summary judgment, without specifying which relief Defendants seek with regard to each of Plaintiff's 12 claims. In filing their motion, Defendants advised Plaintiff that failing to respond in opposition to such motion, as Fed.R.Civ.P. 56(e) requires, could result in a dismissal of part or all of Plaintiffs' action. Notice of Motion at 3. Plaintiff has responded in opposition to Defendants' motion by relying on his Complaint, the transcript of his deposition testimony, and numerous exhibits attached to Plaintiff's papers in opposition to Defendants' motion.

The same analysis applicable to a Fed. R.Civ.P. 12(b)(6) motion to dismiss applies to a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994). In particular, " '[o]n a motion to dismiss or for judgment on the pleadings, [the court] must accept all allegations in the complaint as true and draw all inferences in the nonmoving party's favor.' " *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir.2009) (quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003) (bracketed material added and additional quotation omitted)). On a motion to dismiss under Rule 12(b), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir.2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable

inferences in the plaintiff's favor). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Generally, a motion for judgment on the pleadings must be based upon the pleadings, and not on additional evidence submitted by any party. *See Sira v. Morton*, 380 F.3d 57, 66–67 (2d Cir.2004) (observing that where moving party submits material outside the pleadings in support of motion for judgment on the pleadings, the motion should be converted to a motion for summary judgment). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira*, 380 F.3d at 67 (citing cases and Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")). Where, however, as here, a movant relies on papers outside the pleadings which have not been incorporated by reference, the motion must be converted to one for summary judgment. *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir.2009) ("a district court acts property in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings . . . .").

In the instant case, Defendants submit in support of their motion, numerous Declarations of various Defendants, Doc. Nos. 107 (Bennett), 108 (Dr. Canfield), 109 (Dr. Desai), 110 (Eagen), 111 (Fowler), 113 (English), 114 (Hopkins), 116 (Rabideau), 117 (Dr. Trabout), 118 (Dr. Wright), and 119 (Dr. Yin), portions of Plaintiff's June 29, 2007 deposition testimony, Defendants' Exh. A, and Plaintiff's medical records. Defendants' Exh. B. Further, although converting a motion for judgment on the pleadings "requires that the court give 'sufficient notice to an opposing party and an opportunity for that party to respond,'" *Hernandez*, 582 F.3d at 307 (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir.1995)), in the instant case, as an alternative to judgment on the pleadings, Defendants have also moved for summary judgment. Significantly, Defendants have not specified for each of Plaintiff's claims whether Defendants seek judgment on the pleadings of summary judgment. Furthermore, Defendants, in filing their motion, advised Plaintiff of the need to file papers and affidavits in opposition to Defendants' motion, in compliance with Fed.R.Civ.P. 56(e), to avoid dismissal of the claims. As such, Plaintiff has received sufficient notice of the possibility that Defendants seek summary judgment as to each of his claims, and the court considers only whether each of Plaintiff's claims can survive summary judgment.

Summary judgment on a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.2010). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a

summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■ Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor and "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (citing cases). Rather, Fed.R.Civ.P. 56(e) requires that

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

"[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996). Furthermore, because Plaintiff is proceeding *pro se,* the court is required to liberally construe Plaintiff's papers submitted in opposition to summary judgment. *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) ("It is well established that the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'") (quoting *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir. 2006))

Plaintiff maintains Defendants violated his civil rights under 42 U.S.C. § 1983,

pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. Section 1983, however, "'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Baker, supra,* at 140, 99 S.Ct. 2689). In the instant case, the Complaint alleges Defendants violated Plaintiff's under the First, Eighth, and Fourteenth Amendments by exhibiting deliberate indifference to Plaintiff's serious medical needs, and interfering with Plaintiff's attempts to file grievances regarding his medical care.

### 1. Eighth Amendment Claims

■ Plaintiff's First, Second, Third, Fourth, Fifth, Seventh and Eighth Claims all allege violations of Plaintiff's Eight Amendment rights based on a denial of, or improper medical care. The Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296–97, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Deliberate indifference to an inmate's serious medical needs is within the ambit of the Eighth Amendment protection. *Trammell v. Keane,* 338 F.3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive

force, conditions of confinement, and denial of medical care).

■■ "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (bracketed text in original)). In addition to death, a serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance*, 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir.2003) (citing *Estelle*, 429 U.S. at 104, 97 S.Ct. 285, and *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996)).

■ Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *see Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards.by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■ Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison*, 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). A "mere disagreement" with a physician over the appropriate course of treatment does not arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance*, 143 F.3d at 703. Regardless, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

■ As to the objective prong, a sufficiently serious condition is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway*

*v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). With regard to the subjective prong, Plaintiff must establish Defendants "kn[e]w[ ] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. The court addresses whether Plaintiff can survive summary judgment on each of his Eighth Amendment deliberate indifference claims.

## A. First Claim

### 1. Timeliness of First Claim

Preliminarily, the court observes that Defendants seek summary judgment on Plaintiff's claims that accrued more than three years before February 3, 2003, the date Plaintiff placed the Complaint in the mail for filing, specifically, Plaintiff's First Claim regarding the discogram performed at Strong Memorial on November 24, 1999, and the subsequent infection Plaintiff developed as a result. Defendants' Memorandum at 11–12 (referencing Complaint ¶¶ 1–37 and 43). Plaintiff has not responded in opposition to this argument.

■■■■■■ It is settled that in New York, § 1983 actions are subject to a limitations period of three years. *Jewell v. County of Nassau,* 917 F.2d 738, 740 (2d Cir.1990) ("New York's three year statute of limitations under N.Y.Civ.Prac.L. & R. 214(2) (McKinney 1990) governs § 1983 actions filed in federal district court in New York."). Further, for statute of limitations purposes, an inmate's complaint "is deemed 'filed' on the date the complaint is delivered to prison officials for transmittal to the court." *Covington v. City of New York,* 171 F.3d 117, 120 n. 1 (2d Cir.1999). As such, any claims that accrued more than three years prior to the date Plaintiff's complaint is deemed filed are timebarred which, in this case, would be Plaintiff's First Claim alleging an Eighth Amendment claim for deliberate indiffer-

ence to a serious medical need based on the infection Plaintiff suffered as a result of the November 24, 1999 discogram performed at Strong Memorial, and from which Plaintiff had recovered by December 16, 1999, at which time Plaintiff was released from Elmira's infirmary and returned to Elmira's general prison population. Complaint ¶¶ 1–37 and 43.

Initially, the court observes that it is recommending that Plaintiff's deliberate indifference claim pertaining to the infection Plaintiff developed following the November 24, 1999 discogram be denied on the basis that Plaintiff is unable to establish the subjective element of such claim. Discussion, *infra,* at 183. Nevertheless, because the action is before the undersigned for a report and recommendation, the court, in the alternative, addresses whether such claim is timebarred.

■■■■ In an addendum attached to the Complaint, Plaintiff explains that on December 9, 2002, Plaintiff placed the Complaint in a mail receptacle, along with two inmate account disbursement forms, authorizing the appropriate amount of postage and the court's $150 filing fee to be deducted by Plaintiff's inmate account. Complaint Addendum. Plaintiff, however, maintains the postage disbursement authorization form "was 'lost' or otherwise misplaced" and that the Complaint was returned to Plaintiff on January 7, 2003. *Id.* Plaintiff further maintains that on December 9, 2002, Elmira "went on 'lock down' and mail both incoming and exiting was affected by said lockdown." *Id.* As such, because it was not Plaintiff's fault that the Complaint was not mailed to the court on December 9, 2002, Plaintiff requests the court to deem his Complaint filed as of that date. *Id.*

The court observes that the Complaint indicates it was signed by Plaintiff on December 9, 2002, Complaint at 7, a fact

Defendants' acknowledge. Defendants' Memorandum at 11 ("The 'addendum' to the Complaint herein clearly states that the plaintiff placed the Complaint in the mail on February 2, 2003, although he also asserts that he mailed a previous copy to the Court on December 9, 2002."). An issue of fact thus exists as to whether Plaintiff, as he maintains, Complaint Addendum, originally delivered the Complaint to prison officials for transmittal to the court on December 9, 2002, or on February 3, 2003. As such, there is an issue of fact as to whether the three-years statute of limitations has run with regard to Plaintiff's First Claim precluding summary judgment.

Moreover, although Plaintiff developed the infection from the discogram on November 26, 1999, more than three years before December 9, 2002, that Plaintiff continued to be house in Elmira's infirmary for treatment of the infection until December 16, 1999, implies that Plaintiff's alleged § 1983 deliberate indifference claim relative to the infection was a continuing violation such that the three-year limitations period continued beyond the initial accrual date of November 26, 1999. *See Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir.2009) ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). The continuing violation doctrine applies where the plaintiff alleges both the existence of an ongoing policy of deliberate indifference to his or her serious medical needs and some acts that are not time-barred and are taken in furtherance of that policy. *Id.*

Summary judgment on the basis that Plaintiff's First Claim relative to the infection caused by the November 24, 1999 discogram is time-barred therefore should be DENIED.

## 2. Merits of First Claim

Plaintiff alleges that Defendants acted with deliberate indifference to serious medical need in connection with a "discogram" medical procedure Plaintiff underwent on November 24, 1999 (First Claim) Defendants seek summary judgment on these claims on the basis that Plaintiff cannot establish both the objective and subjective elements for these claims. Defendants' Memorandum at 6–9.

■ In particular, Defendants maintain that Plaintiff's did not suffer from the requisite "condition of urgency, one that may produce death, degeneration, or extreme pain" for the objective element. *Id.* at 7 (quoting *Hathaway*, 99 F.3d at 553). The record, however, establishes that the infection Plaintiff suffered following the discogram was sufficiently serious as to meet the objective element of an Eighth Amendment deliberate indifference claim. In particular, Plaintiff ran a high fever for several days, requiring that Plaintiff be admitted to Elmira's infirmary for treatment with intravenous antibiotics. Medical Records at Bates Nos. 000539–56, 000575. Such acute infectious conditions, accompanied by pain, have been held to satisfy the objective element of an Eighth Amendment deliberate indifference claim. *See, e.g., Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir.2006) (holding Hepatitis C infection satisfies objective element); *Chance*, 143 F.3d at 702–03 (infected tooth causing great pain, rendering inmate unable to chew tooth, and resulting in need to have more teeth extracted was serious medical condition under Eighth Amendment); *Hardy v. City of New York*, 732 F.Supp.2d 112, 129–30 (E.D.N.Y.2010) (ear infection resulting in "excruciating pain," swelling, drainage and difficulty walking was serious medical need for objective prong of Eighth Amendment deliberate indifference claim).

■ With regard to the subjective element, Defendants maintain that the affidavits of the Defendant medical personnel, along with Plaintiff's medical record, establish that Plaintiff's complaints regarding the infection were addressed with Plaintiff provided with medical treatment and tests, such that Plaintiff recovered from the infection, and that any disagreement of Plaintiff regarding his medical care is insufficient to support the subjective element of an Eighth Amendment claim. *See Chance*, 143 F.3d at 703 ("It is well-established that the mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Here, the medical record establishes that although Plaintiff did, in fact, suffer a bacterial infection at the site of the discogram dye injection, he received adequate medical care, recovered from the infection in less than three weeks, and was without fever for more than two weeks prior to being discharged from the infirmary. *See* Dr. Yin Declaration ¶¶ 4–5; Dr. Desai Declaration ¶ 5; Medical Record at Bates No. 000068. Although Plaintiff maintains the infection would have been avoided had Plaintiff, on November 26, 1999, been returned to the neurosurgeon who performed the discogram, Complaint ¶ 10, such claim merely expresses that Plaintiff would have preferred a different course of treatment, and has no bearing on the state of mind of any Defendant involved with either the procedure or treating Plaintiff's infection. Plaintiff has provided no affidavit from any medical treatment provider substantiating Plaintiff's assertion that had

Plaintiff been immediately returned to the neurosurgeon who performed the discogram, Plaintiff would have avoided the infection altogether. Plaintiff thus has failed to establish the subjective element of this claim.

Summary judgment on Plaintiff's First Claim should be GRANTED in favor of Defendants.

## B. Second Claim [4]

Plaintiff alleges he has long suffered from a degenerative disc disease, which has caused him great pain, for which surgery was recommended and originally scheduled for December 15, 2000, but that the surgery was postponed to retaliate against Plaintiff for filing grievances,[5] that the delay has resulted in additional degeneration and pain, and that Plaintiff has been denied treatment at a pain management clinic and pain medication. (Second Claim). Defendants seek summary judgment on this claim on the basis that Plaintiff can neither establish that his degenerative disc disease is "a condition of urgency, one that may produce death, degeneration or extreme pain," *Hathaway*, 37 F.3d at 66, or that Defendants "kn[e]w[ ] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Defendants' Memorandum at 6–9. Here, the record establishes that Plaintiff has met his burden to avoid summary judgment on this claim.

■ With regard to the objective element, it is undisputed that Plaintiff's degenerative disc disease caused Plaintiff back pain that was so extreme that he was referred to a pain management clinic and prescribed methadone. Complaint ¶¶ 36–53. Plaintiff was first prescribed metha-

---

**4.** Many of the factual allegations pertaining to Plaintiff's Second Claim actually appear under Plaintiff's First Claim.

**5.** Plaintiff's retaliation claim is addressed below in connection with Plaintiff's Ninth and Tenth Claims.

done on April 19, 2001, *id.* ¶ 50, and continued to receive it at least through September 2002. *Id.* ¶ 60. Plaintiff's methadone prescription frequently was not immediately renewed when it expired, causing Plaintiff to experience not only the return of his back pain, but also withdrawal symptoms given methadone's highly addictive nature. *Id.* ¶¶ 51–55. Plaintiff's medical records are consistent with Plaintiff's allegations of pain treatment and gaps in receiving methadone. *See, e.g.,* Medical Records at Bates Nos. 000210 (Ambulatory Health Record entry dated April 19, 2001, indicating Plaintiff was prescribed methadone and darvocet for back pain); 000222 (Ambulatory Health Record entry dated May 23, 2001, indicating Plaintiff was requesting renewal of methadone prescription); 000228 (Ambulatory Health Record entry dated June 25, 2001, indicating methadone prescription was renewed for 30 days); 000233 (Ambulatory Health Record entry dated July 24, 2001, indicating methadone prescription renewed for 30 days); 000241 (Ambulatory Health Record entry dated August 29, 2001, indicating methadone prescription renewed for 30 days). As such, Plaintiff has established the objective element of his Second Claim. *See Brock v. Wright,* 315 F.3d 158, 161 (2d Cir.2003) (holding doctor's affidavit supporting inmate plaintiff's claim of chronic pain ranging from annoying to extreme, caused by scar tissue, was sufficient proof to avoid summary judgment on Eighth Amendment deliberate indifference claim).

With regard to the subjective element, there is a material issue of fact in the record as to why Plaintiff's surgery scheduled to be performed by Dr. Mosher at SUNY Upstate on December 15, 2000, was canceled. Plaintiff attributes the cancellation to N.P. Fowler, with the approval of Drs. Yin and Desai, because Plaintiff had refused to undergo a required pre-operation chest X-ray, which Plaintiff maintains his medical records establish was not re-quired. Complaint ¶¶ 86–88. Defendants, in contrast, assert that Dr. Mosher, an orthopedist, who was then associated with Wexford, a medical firm that had contracted with DOCS to provide medical services to inmates, later discontinued his association with Wexford, resulting in a cancellation of Plaintiff's shoulder surgery. Defendants' Statement of Facts ¶ 13. Following the cancellation of Plaintiff's shoulder surgery, Plaintiff was examined by another orthopedist, Dr. Kaempffe, who recommended more conservative treatment instead of surgery, *id.* ¶ 15, which Plaintiff maintains has caused him unnecessary pain and suffering. Complaint ¶ 93.

Significantly, Plaintiff has submitted copies of his medical records suggesting that, as Plaintiff maintains, Plaintiff's surgery was canceled because Plaintiff failed to undergo a chest X-ray which was not necessary. *See* Medical Record at Bates Nos. 000874 (December 5, 2000 letter from Dr. Wright to Plaintiff advising that the cancellation of Plaintiff's surgery "resulted from the inability to comply with a pre-surgical requirement. I understand that you have since had the x-ray and are approved and scheduled for orthopedic surgery."); 000918 (January 25, 2001 letter from Dr. Wright to Plaintiff advising Plaintiff's surgery was canceled "due to your unwillingness to comply with pre-surgical requirements. The second cancellation resulted from the original surgeon making a determination that he would not pursue surgery because he felt you would be a compliance risk."). Neither of these explanations mentions that Dr. Mosher was no longer associated with Wexford. Nor do Defendants deny that, to date, Plaintiff has not undergone the surgical procedure on his shoulder, or that Plaintiff's shoulder continues to deteriorate.

The questionable nature as to the cancellation of Plaintiff's shoulder surgery,

along with the continued denial of such treatment, resulting in undeniable deterioration of Plaintiff's painful disc disease establishes a material issue of fact as to the subjective element of Plaintiff's Second Claim. Summary judgment on Plaintiff's Second Claim should thus be DENIED.

## C. Third and Fourth Claims

Plaintiff's Third Claim alleges denial of medical treatment for allergies, and his Fourth Claim alleges denial of medical treatment for shortness of breath and possible asthma. Defendants maintain Plaintiff is unable to establish the objective and subjective elements for these Eighth Amendment deliberate indifference claims. Defendants' Memorandum at 6–9. In opposition to summary judgment, Plaintiff maintains that although Plaintiff was provided with medical consultations for such conditions by physicians outside of DOCS, Defendants have refused to act in accordance with the instructions of such physicians by denying Plaintiff the recommended allergy injections and refusing to transfer Plaintiff to the infirmary where the level of allergens is lower.

■ The record establishes that Defendants arranged for Plaintiff to undergo allergy testing by one Dr. Sivak on March 25, 2002, following which allergy sensitivity injections were recommended, Medical Record at Bates No. 001142, but that when Plaintiff arrived for his allergy injection, Plaintiff objected to the fact that the injection serum was not drawn into the syringe within Plaintiff's view, such that Plaintiff did not trust that he was receiving the correct serum and refused the injection. *Id.* at Bates Nos. 000268, 000288, 0000295, 000297, 001166, 001167. Because the allergy serum has a limited life span, it became outdated and unusable with Plaintiff never having received an injection. Dr. Canfield Declaration ¶ 10. Furthermore, although Dr. Sivak had suggested Plaintiff undergo

a "methacholine challenge test" if allergy injections did not help alleviate Plaintiff's allergy symptoms, Medical Record at Bates No. 001142, because Plaintiff never received any allergy injections, it was not possible to determine whether Plaintiff would have responded to such injections, thereby rendering the methacholine challenge test not medically indicated. Dr. Canfield Declaration ¶ 10. Significantly, Plaintiff does not dispute Defendants' description of events, which are supported both by affidavits made by persons with personal knowledge of the events, *e.g.*, Dr. Canfield Declaration ¶ 10 (explaining that Plaintiff's continued refusal of his allergy injection resulted in the serum expiring before Plaintiff ever received an injection), as well as by Plaintiff's medical records, *e.g.*, Medical Record at Bates Nos. 000268, 000288, 0000295, 000297, 001166, 001167.

On this record, Plaintiff cannot establish, with regard to the Third Claim alleging denial of treatment for Plaintiff's allergies, the subjective element of such claim. Summary judgment should thus be GRANTED in favor of Defendants on Plaintiff's Third Claim

■ Similarly, with regard to Plaintiff's Fourth Claim alleging denial of treatment for Plaintiff's breathing difficulties and possible asthma, such claim is based on the failure of Defendants Drs. Desai, Yin, Canfield, Wright, and Trabout, Frawley, Hopkins, and Bennett, to arrange for Plaintiff's transfer to Elmira' infirmary where, according to Plaintiff, the level of allergens is lower. Defendants maintain that DOCS policies and space considerations prevent inmates from being housed in a correctional facility's infirmary absent a need for constant medical care and attention, rather than for an inmate suffering from allergies. Dr. Yin Declaration ¶ 14; Dr. Desai Declaration ¶ 11; Dr. Canfield Declaration ¶ 13; Dr. Trabout Declaration ¶ 11. Defendants further deny that

the infirmary has, as Plaintiff contends, a regulated environment with windows that are sealed against allergies, and although the infirmary is air-conditioned, the infirmary has special ventilation only for isolation of persons with infectious diseases, a condition not applicable to Plaintiff. *Id.*

Dr. Canfield also asserts that he has performed two pulmonary function tests on Plaintiff in 2003 and 2004, neither of which showed any gross abnormality in lung function, and both of which were nearly identical to another pulmonary lung function test performed in 2002. Dr. Canfield Declaration ¶ 12. Accordingly, Dr. Canfield is of the opinion that Plaintiff's lung function had not deteriorated during that time. *Id.*

Plaintiff has not submitted any evidence calling into question the validity any of these sworn statements, as is Plaintiff's burden on summary judgment. As such, summary judgment on Plaintiff's Fourth Claim alleging denial of treatment for his breathing difficulties and possible asthma should be GRANTED.

### D. Fifth Claim

Plaintiff's Fifth Claim alleges Defendants were deliberately indifferent to his serious medical needs, *i.e.,* his allergies and possible asthma, by placing him in a cell where Plaintiff was constantly exposed to second-hand tobacco smoke and other allergens. Defendants seek summary judgment on this claim on the basis that Plaintiff is unable to establish that his exposure to ETS and other allergens at Elmira posed a substantial risk of serious harm to Plaintiff. Defendants' Memorandum at 4–6.

 To prevail on his Eighth Amendment claims based on exposure to ETS, Plaintiff must "prove both the subjective and objective elements necessary to prove an Eighth Amendment violation." *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). As to the objective element, Plaintiff must show he has suffered serious health problems caused by exposure to "unreasonably high levels of ETS." *Id.* With regard to the subjective element, Plaintiff must show Defendants knew of and deliberately disregarded "an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Here, Plaintiff has established material issues of fact as to whether he suffers serious health problems caused by exposure to ETS, as well as whether Defendants knew of, yet disregarded, an excessive risk to Plaintiff's health.

In particular, the Second Circuit has held that the objective requirement of an Eighth Amendment claim based on ETS exposure is satisfied where the plaintiff establishes he acquired asthma, suffered asthma symptoms, chest pain, eye irritation, breathing difficulties, fatigue, and dizziness after being exposed to ETS at a correctional facility. *See Colon v. Drew,* 335 Fed.Appx. 86, 88 (2d Cir.2009) (vacating summary judgment in favor of defendant prison warden on Eighth Amendment ETS exposure claim). Similarly, in the instant case, the medical record establishes Plaintiff has experienced breathing difficulties, developed allergies, possibly suffers from asthma, and that such conditions have deteriorated since being incarcerated at Elmira, as a result of which Plaintiff was seen by two allergy consultants. *See, e.g.,* Medical Records at Bates Nos. 001127 (Strong Memorial Clinic Note by Richard J. Looney, M.D., noting Plaintiff's history of shortness of breath, nasal congestion, and sneezing, and that allergy skin tests performed October 16, 2001 revealed allergies to house dust mites, tree mix, grass mix, ragweed, and Alternaria (fungi/mold)); 001128 (Request and Report of Consultation dated January 13, 2002, indicating Plaintiff's allergy symptoms were worsening). Plaintiff has thus established the objective element of his Fifth Claim.

With regard to the subjective prong, Plaintiff submits copies of grievances he filed establishing he repeatedly complained of exposure to ETS, but that Defendants did nothing about such complaints. *See Colon*, 335 Fed.Appx. at 88 (subjective element for Eighth Amendment ETS exposure claim met by establishing defendant failed to take any action in response to plaintiff's repeated complaints regarding such exposure). Significantly, in the instant case, Defendants rely on the fact that DOCS, since January 1, 2001, has banned all smoking inside DOCS facilities, Defendants' Memorandum at 5, and that Plaintiff is unable to demonstrate his exposure to ETS has been sufficient to cause or aggravate a current or future serious illness. *Id.* at 5–6. Defendants do not, however, contest Plaintiff's allegation that, except for the infirmary, DOCS indoor smoking ban is not strictly enforced, Complaint ¶ 138–39, or that Plaintiff's continued exposure to ETS has exacerbated his allergies and possible asthma, *id.* ¶¶ 173–75, thus establishing for summary judgment purposes the requisite nexus between the alleged exposure to ETS and his allergy and possible asthmatic condition. *Colon*, 335 Fed.Appx. at 88.

On this record, summary judgment on Plaintiff's Fifth Claim therefore should be DENIED.

### E. Seventh Claim

Plaintiff alleges that after obtaining a prescription for new eyeglasses, Defendants delayed in providing Plaintiff with new eyeglasses, and also forbade Plaintiff from ordering new eyeglasses from an outside source, resulting in Plaintiff experiencing eyestrain and headaches. Complaint ¶¶ 193–202. Although Defendants have moved to dismiss all Plaintiff's claims, Defendants have not specified the basis on which summary judgment is sought on

Plaintiff's Seventh Claim, other than a general argument that such claim does not meet the criteria for an Eighth Amendment deliberate indifference claim, *i.e.*, "a condition of urgency, one that may produce death, degeneration, or extreme pain." Defendants' Memorandum at 6–9. Nor has Plaintiff argued in further support of this claim.

Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by itself, gives the court reason to deem the claim abandoned. *See Molinari v. Bloomberg*, 564 F.3d 587, 609 n. 15 (2d Cir.2009) (deeming abandoned claim to which appellant offered no response to appellees' argument on appeal); *Kuebel v. Black & Decker (U.S.) Inc.*, 2010 WL 1930659, at *1 (W.D.N.Y. May 12, 2010) (citing *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (collecting cases))). As such, Defendants' motion should be GRANTED in favor of Defendants on this claim. Alternatively, the court addresses the merits of this claim because the matter is before the court for a report and recommendation.

An inmate's need for prescription eyeglasses can constitute a serious medical condition for purposes of the Eighth Amendment where the failure to provide the inmate with eyeglasses causes the inmate to suffer headaches and deteriorating vision, such that the inmate is impaired in daily activities. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.1996) (eyeglasses needed to avoid double vision and loss of depth perception as a result of prior head injury, causing inmate to fall or walk into objects). In the instant case,

the record establishes that Plaintiff has encountered problems obtaining proper prescription eyeglasses. *See, e.g.* Medical Record at Bates No. 000823 (indicating Plaintiff picked up new prescription eyeglasses on September 6, 2000, but sent them back the same day because of an unspecified "error in lenses"). *See also* Medical Record at Bates No. 000872–73 (letter dated December 5, 2000, from Plaintiff's then attorney Melissa B. Papke, Esq., to Elmira Superintendent Bennett advising that Plaintiff had complained of eight consecutive errors in filling Plaintiff's eyeglasses prescriptions, at one time waiting more than three months for a new pair which had incorrect lenses, and that as a result of the delays and errors, by the time Plaintiff received a pair of eyeglasses consistent with his prescription, Plaintiff's vision had again changed and the prescription was no longer accurate). Nevertheless, although Plaintiff maintains that his inability to obtain proper eyeglasses required Plaintiff rely on his outdated prescription lenses, resulting in eyestrain and headaches, Complaint ¶ 197, Plaintiff fails to allege that such symptoms impaired Plaintiff's daily activities.[6]

Nor is there any merit to Plaintiff's assertion that Defendants refused to permit Plaintiff to obtain corrective lenses from an outside source, rather than from DOCS's ophthalmology laboratory where inmates' eyeglass prescriptions were generally filled. Complaint ¶ 199. Rather, the record establishes that Plaintiff did, on at least one occasion, order eyeglasses from Prism Optical, Inc. ("Prism"), the eyeglasses arrived on August 15, 2001, but that Plaintiff was unhappy with the eyeglasses and returned them to Prism on August 30, 2001. Medical Record at Bates No. 001060 (Plaintiff's November 8, 2001 memorandum to Bennett advising that on July 26, 2001, Plaintiff ordered eyeglasses from an outside source, Prism Optical, Inc., the eyeglasses were received at the correctional facility and provided to Plaintiff on August 15, 2001, yet Plaintiff returned them on August 30, 2001, because he was not happy with their "fit"). Other evidence in the record establishes that Plaintiff received a new pair of eyeglasses from Prism on November 15, 2001, but that Plaintiff was unhappy that he did not receive a "hard case" for the new eyeglasses. Medical Record at Bates No. 001066.

The evidence in the record thus fails to establish a material issue of fact as to whether Plaintiff, as a result of delays in obtaining proper prescriptive lenses, suffered from a serious medical condition. Summary judgment on this claim should be GRANTED in favor of Defendants.

### F. Eighth Claim

Plaintiff claims that Jeffrey Goldman, M.D. ("Dr. Goldman"), treated Plaintiff at Strong Memorial for GERD and hypertension, and that part of the treatment included placing Plaintiff on a low fat, low salt, kosher diet which Defendants have refused to provide, causing Plaintiff's cholesterol and blood pressure to rise to unsafe levels, requiring Plaintiff be prescribed Lipitor to lower his cholesterol. Complaint ¶¶ 203–15.[7] Defendants argue in support of sum-

---

6. The court notes that although Plaintiff complained on April 10, 2001, of problems with his near vision and reading, Plaintiff continued to research and write in support of his then-pending legal actions. Nor does Plaintiff assert that inadequately corrected vision caused him any delays or interfered with his pursuit any legal actions.

7. Plaintiff does not specify when Dr. Goldman prescribed the low fat, low salt, kosher diet, when Defendants' allegedly denied Plaintiff the medically prescribed diet, or whether Defendants continue to deny Plaintiff the diet.

mary judgment that Plaintiff was provided with a low fat, low salt, kosher diet while housed at Elmira. Defendants' Memorandum at 11.

Preliminarily, Plaintiff has failed to argue in opposition to Defendants' motion for summary judgment on this claim. As such, the court may, in its discretion, deem Plaintiff's improper diet claim abandoned based on Plaintiff's failure to argue in opposition to summary judgment on the claim. *See Molinari,* 564 F.3d at 609 n. 15; *Kuebel,* 2010 WL 1930659, at *1. Because the matter is before the court for report and recommendation, however, the court addresses, in the alternative, the merits of such claim.

 It is established that the intentional failure to provide an inmate with a medically prescribed diet for a prolonged period of time can state a viable Eighth Amendment claim. *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y. 1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (Eighth Amendment's prohibition against cruel and unusual punishment requires serving inmates nutritionally adequate food prepared and served under conditions that do not present imminent danger to health and well-being of inmates who consume it)). *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (holding complaint alleging prison officials deprived inmate of nutritionally adequate diet for 14 straight days and knew that inmate's diet was inadequate and likely to inflict pain and suffering asserted Eighth Amendment claim); *Johnson v. Harris,* 479 F.Supp. 333, 336–37 (S.D.N.Y.1979) (holding defendant prison physician, by continually ignoring special diet requirements for inmate with serious diabetic condition, was deliberately indifferent to inmate's serious medical need in violation of the Eighth Amendment). Significantly, Defendants do not dispute that Plaintiff's medical condition required a low

fat, low salt, kosher diet, or that such a diet was prescribed for and provided to Plaintiff.

Plaintiff's restricted diet is discussed in only two of the numerous documents contained in Plaintiff's vast medical record. In a Diet Procedures/Attendance Agreement ("Diet Agreement") dated April 5, 2000, Bennett advises Plaintiff that "[a] low cholesterol diet has been prescribed by [Plaintiff] health care provider," that the diet is "structured to include a minimum of 3 meals a day," and that missing too many of the diet's meals will render the diet ineffective. Medical Record at Bates No. 000676. Plaintiff was further advised that he "can obtain your diet by following facility procedures. Meal attendance for therapeutic diets is mandatory and will be monitored." *Id.* Inmates who miss three or more meals during one week will be considered noncompliant and may be removed from the diet. *Id.* The Diet Agreement is signed by Plaintiff and witnessed by Defendant Frawley. *Id.*

On a Refusal of Medical Examination and/or Treatment form ("Treatment Refusal") dated January 12, 2001, Medical Record at Bates No. 000912, Plaintiff requested to be removed from the "low fat low chol. diet" because pain rendered Plaintiff unable to attend all his meals in accordance with the Diet Agreement. In signing the form, Plaintiff noted he was "[b]eing *compelled* to sign this form in order to avoid disciplinary action for 'missing' diet meals in messhall due to pain caused by sitting on stools and Dr. Cheng Yin's refusal to continue orders for meals in cell." *Id.* (underlining in original).

In support of their contention that Plaintiff was provided with a low fat, low salt, kosher diet, Defendants reference Defendants' Statement of Facts, Defendants' Memorandum at 11 (citing Defendants' Statement of Facts ¶ 30), which references

the Declarations of Drs. Yin and Desai. Defendants' Statement of Facts ¶ 30 (citing Dr. Yin Declaration ¶ 19; Dr. Desai Declaration ¶ 30). Neither Dr. Yin nor Dr. Desai, however, state that Plaintiff was provided with a low fat, low salt, kosher diet. Rather, both physicians state that a low fat, low salt diet is available at Elmira, and that they "understand" that Plaintiff was provided with such diet, and that as physicians, they have no "role in determining the contents of the kosher diet." [8] Dr. Yin Declaration ¶ 19; Dr. Desai Declaration ¶ 30.

As such, Defendants have failed to make a properly supported showing as to the absence of any genuine issue of material fact on this claim, and Plaintiff thus is not required to present evidence sufficient to support a jury verdict in its favor to defeat summary judgment. *Goenaga*, 51 F.3d at 18. Moreover, the Treatment Refusal's reference to Plaintiff's having been taken off the Diet Agreement raises a material issue of fact as to whether Plaintiff is, in fact, receiving the prescribed diet.

Nevertheless, Plaintiff points to no evidence of any adverse health impact caused by the discontinuance of the Diet Agreement, and the court's review of the record reveals none. Rather, a perusal of Plaintiff's medical record establishes that, despite Plaintiff's allegations to the contrary, Complaint ¶¶ 209–11, Plaintiff did not, after removing himself from the Diet Agreement on January 12, 2001, experience elevated blood pressure or cholesterol. *See, e.g.,* Medical Record at Bates No. 001015 (cholesterol 140 mg/dl on July 3, 2001); 001074 (cholesterol 133 on December 6, 2001); 001050 (blood pressure 110/70 on October 12, 2001); 000993 (blood pressure 122/84 on May 3, 2001); 001157 (blood pressure 140/84 on April 15, 2002).

In the absence of any evidence establishing the objective component of Plaintiff's Eighth Amendment deliberate indifference claim based on Defendants' alleged failure to provide Plaintiff with a proper diet, Plaintiff's Eighth Claim alleging deprivation of a medically prescribed diet fails. Accordingly, summary judgment on Plaintiff's Eighth Claim should, on its merits, be GRANTED.

### G. Eleventh Claim

Plaintiff makes a general allegation that Defendants repeatedly ignored unspecified "Sick Call Slips" by which Plaintiff requested sick call, thereby depriving Plaintiff of medical treatment. Complaint ¶¶ 243–53. In support of summary judgment, Defendants assert that none of Plaintiff's many sick call requests were ignored and Plaintiff "was seen multiple times for assorted medical complaints," and that Plaintiff's Medical Record establishes Plaintiff was placed on sick call multiple times each month. Defendants' Memorandum at 10–11. Plaintiff has not argued in further support of this claim in opposing Defendant's motion.

Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by itself, gives the court reason to deem the claim abandoned. *Sebast v. Mahan*, 754 F.Supp.2d 423, 432–33 (N.D.N.Y.2010). Moreover, although deliberate indifference to an inmate's serious medical needs can establish an Eighth Amendment violation, *Trammell*, 338 F.3d at 162, the court's careful review of Plaintiff's Medical Record establishes, as Defendants contend, that Plaintiff was seen in sick call multiple time each month. *See, e.g.,* Medical Record at Bates No. 00002–000093 (showing pages from Plaintiff's

---

**8.** Plaintiff does not assert that he was to be provided with a kosher diet for religious rea- sons.

Ambulatory Health Record establishing Plaintiff had requested and was seen in sick call on at least 50 occasions between January 13, 1999 and March 7, 2000). Defendants have thus satisfied their burden on summary judgment on this claim, and the burden shifts to Plaintiff to produce evidence sufficient to support a jury verdict in his favor on this claim. *Goenaga*, 51 F.3d at 18. Plaintiff, however, points to no evidence establishing that any request for a Sick Call Slip was ever denied, much less a request seeking sick call for a serious medical need sufficient to support a jury verdict on the claim, nor does Plaintiff specify any date on which he was allegedly denied a sick call slip. As such, summary judgment on Plaintiff's Eleventh Claim should be GRANTED in favor of Defendants.

## 2. Fourteenth Amendment Claims (Sixth and Twelfth Claims)

Plaintiff's Sixth Claim alleges a deprivation of privacy, Complaint ¶¶ 180–88, and his Twelfth Claims alleges denial of equal protection, Complaint ¶¶ 254–60, both in violation of the Fourteenth Amendment.

### A. Sixth Claim

Plaintiff alleges Elmira's sick call procedures requiring that, prior to seeing a physician or nurse practitioner, Plaintiff discuss his medical issues with a nurse, while in close proximity to other inmates at sick call such that the inmates were able to overhear each other's discussions of their medical concerns, violated Plaintiff's right to privacy. Complaint ¶¶ 180–88. According to Plaintiff, Elmira's recent change to its sick call procedures providing more privacy to inmates and "is a tacit admission that their former sick call procedure and 'policy' denied [Plaintiff] and other prisoners" privacy in violation of the Fourteenth Amendment. Complaint ¶¶ 189–90. Although inartfully pleaded, Plaintiff's Sixth Claim suggests a violation

of the Fourteenth Amendment's Due Process Clause providing "nor shall any State deprive any person of life, liberty, or property without due process of law. . . ." U.S. Const. amend. XIV, § 1, cl. 3. The court thus construes the claim as such. *Triestman*, 470 F.3d at 474–75.

Defendants argue in support of summary judgment on this claim that Plaintiff's medical concerns discussed at sick call in the presence of other inmates were not of the type of serious medical conditions for which the release of information can implicate Fourteenth Amendment privacy concerns. Defendants' Memorandum at 9–10. Plaintiff has not responded in opposition to summary judgment on this claim.

Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by itself, gives the court reason to deem the claim abandoned. *Sebast v. Mahan*, 754 F.Supp.2d 423, 432–33 (N.D.N.Y. 2010). As the matter is before the court for report and recommendation, however, the merits of Plaintiff's Sixth Claim are addressed.

 The Fourteenth Amendment's Due Process Clause protects an inmate from the unwanted disclosure of information pertaining to an inmate's health. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir.1994) (construing the Fourteenth Amendment's right to privacy as the "right to confidentiality includes the right to protection regarding information about the state of one's health."). Although inmates have a constitutional right to confidentiality in their health status, such right is not absolute. *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir.1999). Privacy interests in medical information vary with the medical condition with certain "unusual" conditions, including positive HIV status and transsexualism being "likely to provoke an both an intense desire to preserve one's

medical confidentiality, as well as hostility and intolerance from others." *Powell*, 175 F.3d at 111. An inmate also cannot expect the constitutional right to privacy to protect against disclosure of medical information that is a matter of public record, or readily observable by the public, such as the obvious use of a knee brace. *See, e.g., Taylor v. Macomber*, 1999 WL 349696, at *3 (S.D.N.Y. May 27, 1999) (holding disclosure of medical information pertaining to inmate plaintiff's knee condition did not violate inmate's privacy rights because inmate's wearing knee brace already informed the public that plaintiff had a knee condition). Further, where an inmate holds a privacy right in maintaining the confidentiality of his medical information, prison officials may impinge on such right only insofar as their actions are reasonably related to penological interests. *Powell*, 175 F.3d at 112.

 In the instant case, Plaintiff has not specified which of his medical conditions he alleges was so "unusual" that the disclosure of information pertaining to such condition arose to a Fourteenth Amendment violation, nor have any of Plaintiff's medical conditions at issue in the instant case been held to meet the required standard. *See, e.g., Watson v. Wright*, 2010 WL 55932, at *1 (N.D.N.Y. Jan. 5, 2010) (disclosure of Hepatitis C status); *Hamilton v. Smith*, 2009 WL 3199531, at *15 and n. 18 (N.D.N.Y. Jan. 13, 2009) (disclosure of Hepatitis A status, high blood pressure and high cholesterol did not violate Fourteenth Amendment privacy rights); *Rush v. Artuz*, 2004 WL 1770064, at *12 (S.D.N.Y. Aug. 6, 2004) (no Fourteenth Amendment privacy right protecting disclosure of wrist injury and stomach problems). Moreover, inasmuch as Plaintiff has alleged difficulty walking as a result of Defendants' alleged improper treatment of Plaintiff's degenerative back condition, Complaint ¶¶ 13–14, such difficulty would be readily observable to other inmates.

Plaintiff's assertion that Elmira's policy change "is a tacit admission that their former sick call procedure" unlawfully violated Plaintiff's privacy rights is without merit. Although the change to Elmira's sick call procedures to ensure inmates are able to discuss their medical concerns in private at sick call may have been motivated by recent court decisions regarding the disclosure of information regarding such serious medical conditions as positive HIV status and transsexualism, which have been recognized as conditions "likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others," *Powell*, 175 F.3d at 111, the procedure change does not establish that the type of medical conditions Plaintiff maintains he was required to discuss within the hearing of other inmates were similarly serious medical conditions. *See also* Fed.R.Evid. 407 (barring as evidence of liability, including "culpable conduct," subsequent remedial measures).

Defendants' motion seeking summary judgment should be GRANTED as to Plaintiff's Sixth Claim.

### B. Twelfth Claim

Plaintiff alleges he was denied equal protection of the law by Defendants who refused to provide Plaintiff with, or even permit Plaintiff to read the post-release treatment plans issued by unspecified hospitals post-surgery, as is Plaintiff's right under New York's Patients Bill of Rights, 10 N.Y.C.R.R. § 405.7. Complaint ¶¶ 254–57. Plaintiff further asserts that Defendants have insisted on selling Plaintiff's post-release treatment plans to Plaintiff. *Id.* ¶¶ 258–60. Defendant move for summary judgment on this claim on the basis that, insofar as Plaintiff maintains his right

to such documents pursuant to New York's Patients Bill of Rights, federal courts have no jurisdiction, under the Eleventh Amendment, over a state law claim brought against state officials where the requested relief would be directed against the state. Defendants' Memorandum at 12 (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Defendants further maintain that medical records, including post-surgery discharge treatment plans, are the property of the medical provider, rather than the patient. Defendants' Memorandum at 12 (citing N.Y. Public Health Law § 17). In opposing Defendants' motion, Plaintiff has not responded in further support of this claim. Nor have Defendants addressed this claim with regard to the Fourteenth Amendment's Equal Protection Clause.

Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by itself, gives the court reason to deem the claim abandoned. *Sebast v. Mahan*, 754 F.Supp.2d 423, 432–33 (N.D.N.Y. 2010). As the matter is before the court for report and recommendation, however, the merits of Plaintiff's Sixth Claim are addressed.

 Plaintiff asserts his Twelfth Claim under the Fourteenth Amendment's Equal Protection Clause, Complaint ¶ 254, which provides no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1, cl. 4. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074–75, 145 L.Ed.2d 1060 (2000) (quoting *Sioux City Bridge Co.*

*v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923)). Although "the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected class, a plaintiff can proceed as a 'class-of-one' by establishing that he or she 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Holmes v. Haugen*, 356 Fed.Appx. 507, 509 (2d Cir.2009) (quoting *Olech*, 528 U.S. at 564, 120 S.Ct. 1073). *See also Roman v. Donelli*, 347 Fed.Appx. 662, 663 (2d Cir.2009) (affirming district court's dismissal of inmate plaintiff's equal protection claim based on defendant prison superintendent's denial of plaintiff's request to visit dying wife and attend her funeral because plaintiff had failed, in raising such a "selective treatment claim" to "show that he was treated differently from other similarly-situated individuals and that the differential treatment was based on impermissible considerations."). Accordingly, here, Plaintiff must establish both that Defendants' refused to provide him with his hospital discharge instructions while providing such instructions to other inmates who were hospitalized, and that Defendants' refusal to provide Plaintiff with hospital discharge instructions was without any rational basis. *See Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir.2001) (affirming district court's grant of summary judgment in favor of defendant on plaintiff's equal protection claim in the absence of any evidence in the record to support a jury's finding of intentional discrimination in terminating plaintiff from police department for use of drug, while continuing to employ another officer who took the same drug).

 In the instant case, Plaintiff has neither alleged, nor provided any evidence establishing a basis for a reasonable jury

to infer that other similarly inmates, similarly situated to Plaintiff, were routinely provided with post-surgical treatment plans upon being discharged from a hospital. As such, Defendants are entitled to summary judgment on this claim. *Holmes*, 356 Fed.Appx. at 509 (affirming district court's grant of summary judgment in favor of defendant correctional officer because inmate plaintiff neither alleged, nor provided a basis for a jury to infer that the defendant correctional officer knew he was treating the plaintiff inmate any differently than any other inmate).

### 3. First Amendment Claims (Ninth and Tenth Claims)

■■■■ Plaintiff alleges Defendants retaliated against Plaintiff for pursuing various administrative and legal claims against Defendants and others by losing or ignoring various inmate grievances Plaintiff filed, Ninth Claim, and by requiring Plaintiff to undergo unnecessary medical testing prior to scheduling surgery on Plaintiff's shoulder. Tenth Claim. For a plaintiff to succeed in a First Amendment retaliation claim, he must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir.2003). Courts are properly skeptical of prisoner retaliation claims as "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exer-

cising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes*, 239 F.3d at 493 (internal quotation marks and citations omitted).

■■■■ The plaintiff "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' [actions]." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). Upon satisfying this burden, the burden shifts to defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, *i.e.*, "even if they had not been improperly motivated." *Graham*, 89 F.3d at 80. "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 148–49 (2d Cir.1999). As discussed below, the record in the instant case establishes a genuine issue of material fact supporting only Plaintiff's Tenth Claim alleging Defendants retaliated against Plaintiff for filing inmate grievances by denying Plaintiff access to specialized medical care absent Plaintiff's compliance with certain conditions not required under the law

### A. Ninth Claim

■■■■ Plaintiff claims that Defendant Graubard interfered with Plaintiff's filing of Inmate Grievances by losing or ignoring numerous, but unspecified grievances Plaintiff filed, and that Plaintiff directly

spoke with Defendant Eagen regarding his lost grievances to no avail. Complaint ¶¶ 216–36. Plaintiff further contends that such action was intended to retaliate against Plaintiff for engaging in constitutionally protected activities of filing complaints with the government seeking redress of grievances. *Id.* ¶¶ 82–83. Defendants seek summary judgment on this claim on the basis that Plaintiff offers nothing in support of such claim other than bare allegations. Defendants' Memorandum at 10. Plaintiff has not responded in further support of this claim.

Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by itself, gives the court reason to deem the claim abandoned. *Sebast v. Mahan,* 754 F.Supp.2d 423, 432–33 (N.D.N.Y. 2010). As the matter is before the court for report and recommendation, however, the merits of Plaintiff's Ninth Claim are addressed.

Although the deliberate interference with an inmate's attempts to file an inmate grievance is a violation of an inmate's First Amendment right to petition for redress of grievances, *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) (First Amendment right of access to the courts extends to the filing of prison inmate grievances), in the instant case, Plaintiff has failed to specifically identify even one of the alleged "numerous" instances of Defendants' alleged interference. It is significant that Defendants have not moved for summary judgment on any of Plaintiff's claims for failure to exhaust administrative remedies, nor challenged Plaintiff's assertions that he has exhausted administrative remedies as to each of his claims, including filing an inmate grievance. Although Defendants are not required, on summary judgment, to prove they did not interfere with Plaintiff's attempts to grieve, Plaintiff is required to point to some evidence in the record, other than self-serving, conclusory

statements establishing his claim, *i.e.,* that Defendants did lose or ignore a specific inmate grievance. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (a self-serving affidavit which reiterates the complaint's conclusory allegations is insufficient to preclude summary judgment (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 ("[t]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without any significant probative evidence tending to support the complaint"))). In the absence of any evidence from Plaintiff, other than bare allegations and self-serving conclusory statements, Defendants motion seeking summary judgment should be GRANTED as to this claim.

### B. Tenth Claim

■ Plaintiff claims that he was subjected to conditions prior to surgery on his shoulder, that were not required of other prisoners, and that prevented Plaintiff from having the surgery, to retaliate against Plaintiff for exercising his First Amendment right to seek redress of grievances. Defendants have not specifically argued for summary judgment on this claim, apparently relying on their argument in support of summary judgment on Plaintiff's Second Claim based on an inability to establish both the objective and subjective elements of such claim. Significantly, Defendants do not dispute that Plaintiff has filed multiple grievances pertaining to the cancellation of such surgery which, to date, Plaintiff has not had, thereby providing evidence of a retaliatory motive. Complaint ¶ 92.

Inasmuch as Plaintiff has established the existence of a material issue of fact regarding whether he was unlawfully subjected to a condition not required under the law prior to surgery, *see* Discussion, *supra,* at 184–85 (discussing conflicting ev-

idence in the record as to whether Plaintiff's surgery was canceled because Plaintiff failed to undergo unnecessary chest X-ray, or because the surgery was to have been performed by Dr. Mosher whose affiliation with Wexford had ceased, raises an issue of material fact precluding summary judgment on Plaintiff's Second Claim), Plaintiff has also, as immediately discussed above, Discussion, *supra*, established a question of fact as to whether the imposition of such condition was done to retaliate against Plaintiff for complaining about his medical care.

Summary judgment on this claim should be DENIED.

## 4. Individual Defendants

Defendants argue in support of summary judgment that all claims alleged against Defendants Eagen, Dr. Trabout, Goord, and Dr. Wright, should be dismissed for lack of personal involvement, none of whom were personally involved in any decisions regarding Plaintiff. Defendants' Memorandum at 6. Plaintiff has not responded in opposition to this argument.

The court may, based on Plaintiff's failure to oppose Defendants' motion seeking summary judgment against Defendants' Eagen, Dr. Trabout, Goord, and Dr. Wright for lack of personal involvement, on this claim, deem such claims abandoned. *Sebast v. Mahan*, 754 F.Supp.2d 423, 432–33 (N.D.N.Y.2010). As the matter is before the court for report and recommendation, the merits of the argument is addressed.

 The mere fact of supervisory authority is insufficient, under § 1983, to demonstrate liability, based on a failure to supervise. *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir.1995). *See also Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir.2003) ("[T]he doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section

1983 on a defendant acting in a supervisory capacity." (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978))). Rather, personal involvement of the defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2003) (holding that to establish liability under § 1983, plaintiff must show defendant was personally involved in the alleged constitutional violation).

 Personal liability of a supervisor may be shown by evidence that (1) the defendant participated directly in the alleged constitutional violation, (2) defendant, after being informed of the constitutional violation by report or appeal, failed to remedy the wrong, (3) defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuation of such custom or policy, (4) defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon*, 58 F.3d at 873. The mere receipt of a letter of complaint from an inmate, however, is insufficient to establish personal involvement and liability under § 1983. *Id.*; *see also Freeman v. Goord*, 2004 WL 2002927, at *5 (S.D.N.Y. Sept. 8, 2004); *Gates v. Goord*, 2004 WL 1488405, at *9 (S.D.N.Y. July 1, 2004); *Greenwaldt v. Coughlin*, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995).

 Significantly, in the instant action, the gravamen of Plaintiff's claims against Defendants Eagen, Dr. Trabout, Goord and Dr. Wright is that such Defendants, upon being advised by Plaintiff of various civil rights violations, failed to investigate such claims or to intervene in the alleged

violations. *See, e.g.,* Complaint ¶¶ 54 (Plaintiff complaint by letter to Dr. Wright regarding denial of methadone pain medication); 71–73 (Plaintiff spoke with Eagen on August 20, 1999 and February 15, 2002, when Eagen toured Elmira, and complained that Graubard ignored and lost Plaintiff's grievances); 74–75 (Plaintiff complained to Goord about Graubard losing or ignoring Plaintiff's inmate grievances by speaking to Goord when he toured Elmira on October 30, 2001, and by writing letters to Goord); and 113 (Plaintiff's spoken complaint to Dr. Trabout regarding denial of Plaintiff's allergy injections were ignored). Not only is the court unable to review the content of Plaintiff's alleged verbal requests to these Defendants, but the contents of the written letters are not in the record, such that it is not possible to determine whether such complaints reasonably should have prompted these Defendants to investigate the complaints or to intervene in the alleged unlawful conduct. *See Colon,* 58 F.3d at 873 (granting summary judgment in favor of defendant DOCS Commissioner where inmate plaintiff failed to establish defendant knew or should have known inmate plaintiff was framed for contraband violations). As such, summary judgment on the claims against Defendants Eagen, Dr. Trabout, Goord and Dr. Wright should, for lack of personal involvement, be GRANTED.

### CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 106), should be GRANTED in part and DENIED in part.

Feb. 24, 2011.